From that, I knew his skills with telekinesis from beginning to end. After a period of chaos, the man finally decided to step out. And people knew that my little brother had achieved a new talent when he went to Uganda. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Thank you. Be seated. Good morning, everyone. The first argued case this morning is number 13-5039, Sufi Network Services against the United States. Mr. Manhart. Good morning, Your Honor. May it please the court. This court should reverse the decision of the Court of Federal Claims because this is a Wunderlach Act case, and the Board of Human Services, Board of Contract Appeals, had substantial evidence for the fact-finding it rendered concerning damages and had applied this court's standard for the determination of the recovery of lost profits damages. The board expressly cited this court's California Federal Bank decision in its Sufi 8 decision and expressly applied that decision both for its lost profits claims, which is one of the largest claims, and for Count 3, its lost profits during the performance time of the period of the contract. That test requires that in order to recover damages, a party seeking lost profits must demonstrate that those profits would have been earned but for the breach. In this circumstance, Sufi didn't even attempt to demonstrate what would have happened but for the breach. That's not true. Of course it attempted to show it. You may differ and the board may differ about whether it sufficiently proved that it had a theory that, roughly speaking, all of the minutes on the hallway phone, to take the big dollar amount, was a pretty good figure for the calls that would have been placed in the room, and that's because there's some reason to think some of those calls would have been shorter and other reasons to think that they would have been larger, and in the absence of any other evidence, that's a pretty good starting point. That's certainly an attempt to show the but forward. Your Honor, I beg to differ. What Sufi did was identify the actual world. Its theory of damages takes one year of a Sufi telephone, not a government telephone, takes 121,000 minutes covered for that year, does not reduce anything for any other usage of that phone for permitted long-distance service, does not make any adjustment for different behavior patterns that would attend to any kind of service which had a fee as opposed to a free service. Again, recognize the phone that they are using as a comparator is a Sufi-installed phone that permitted, that was free, that was available to lodgers to use in the lobby. The only minutes they subtracted from that year snapshot of the recorded records were the local minutes. They did not make any adjustment for anything about long-distance minutes. So what they did was take 120,000 minutes over a period of a year, multiplied that essentially by 12,000, and that is standing as a representative as if 125 million minutes would have been occurred under this contract. And that is simply not a but-for-take. There is no adjustment for what would have happened. That is a demonstration of what actually occurred on that phone. You actually do have to let me ask the question when I start talking. There are reasons which it describes in its brief for why the number of minutes might have been lower, which is that it is cheaper in the hallway, why the number of minutes might have been higher because the people standing in the line waiting place a kind of peer pressure on people to get off the phone and free it for other people. Those seem to me to be two reasonable considerations pointing in different ways about whether the number of minutes in the hallway would have all been in or would have been a good proxy for the number of minutes in the room. As far as I can tell, tell me if I'm wrong, the board relied on one and only one thing, and that is it assumed that all normal work hour calls were official. So it excluded 87% of the minutes simply because that was the number that was off work hours. There are two things to focus on in reviewing what the board had done. And again, the board summarizes all the information available about the telephone usage at pages, joint appendix pages 116 through 120. And what the board looked at was there was a variety of sources of information. The board looked and the question of what the usage was, there were two questions. How much usage was there? And then the question of would all of that usage have transferred in the but-for world? The parties had disparate approaches and presentations. I'm sorry, but the question is not what would all of it had transferred. The question is, is that number a pretty good proxy for the number that would have occurred in the room? Not that every minute would have. Again, if I complete my thought, I'm sorry, I was sort of slow in preparing the groundwork of that. But the first dispute was the board was presented with Sufi's analysis that essentially there would be, for the two large counts that amount to $114 million of the issue here, 125 million minutes of use. The board looked at, that's based on the single Sufi phone. The board, in contrast, looked at the records that were drawn from the so-called DISA records, which was records drawn from 28 phones that were in those hallways over the course of seven years and made adjustments, raised that for gaps in the information data. But using that data, isn't the crucial thing the board did to say only 13 percent of the calls were made outside of normal hours and we will therefore use a 13 percent? That's the second question, really, Your Honor. The first question is the board found that the appropriate estimate of usage on those following phones was 11.8 million minutes over the entirety of the performance period. In contrast, Sufi posited and the court adopted an estimate that calculates up to 125 million. So the first question is 13 percent of what? Is it just under 12 million or is it 125 million? The second question then becomes how much of that usage would have transferred? And we know that Sufi laid claim to every minute without regard to breaking out any official usage on the telephones. We know that- I'm just going to keep coming back to it. The question is not how many of those minutes would have transferred. The question is how many of those would have transferred and how many more minutes might there have been. So maybe if you had 10 people using a phone for 10 minutes, maybe two of them say, I'm not going to place these calls if I had to do it in my home, in the room, because that's going to cost me money. But maybe three others say, I'm going to place the call and I'm going to spend 20 minutes instead of 10 because I don't have these people waiting in line, breathing down my neck, telling me to get off. There are factors going both ways. Well, that's a very legitimate concern and that's why the board moved to the jury verdict for its approximation of damages. The question was a party is not permitted to be placed in a position in breach better than they would have been had they been permitted to perform. And in that circumstance, the board looked at what Sufi offered as the comparator and found that there was simply no basis to translate that volume, that those assumptions simply could not be borne out. And this is a question, again, in which this Court stands in the shoes, looks at the same and applies the same standard that the Court of Federal Claims did, that is, is there substantial evidence that supported the board's determinations? And the board here, again, was the trier of fact. And the board summarized all of that information and found that records from 28 phones over more than a seven-year period with adjustments, with extrapolations was a better benchmark for determining how much was being used here than what Sufi had used because those were actual telephones. Those were actually the phones being ascribed to breach. They were not made available for the express purpose of being free and available as the Sufi phone was. And so the first question is that volume question. Then we turn to how do we extrapolate from that volume? The board accepted that there was the fact of injury, but then the question was how do we calculate that? And that is a fact of this Court's decision in Yankee Atomic last year, which echoes many prior decisions. The calculation and methodology of the termination of damages and causation is a matter of which the trier of fact has discretion, of which the trier of fact is to be entrusted in the first instance. Mr. Maynard, let me ask you a more fundamental question. Is it correct that the government is not challenging the principle of the award of lost profits for damages, however they're measured over the entire initially projected life of this contract? Yes, the board awarded approximately $7.4 million on these claims and we have not appealed that amount. That wasn't my question. I'm sorry. My question is then just to confirm that the government is not challenging the principle that damages would be awarded over the entire initially projected life of the contract. That's correct, Your Honor. That damages could be available. This is a challenge to the calculation of those damages and whether the amount sought was actually proven. Did Sufi carry his burden of proof? Okay. Thank you. Do you want to save some rebuttal time? Certainly, Your Honor. I'd save the remainder of my time. Okay. Then let's hear from the FLE. Mr. Claybrook. Thank you, Your Honor. Good morning. I want to add a dose of record realities to this discussion that we saw in the government's briefs and heard a little bit about this morning in terms of the supply and demand. With Sufi's damages, the guest calling we're talking about here is about eight minutes a day per room. Now, how much does that cost?  That was a below market rate for international calls as the contract required. Eighty-five cents a minute, about eight minutes per room, when often rooms were double, had two people in a room. That amounts to about $7 a day. It's not unlikely that a guest about to enter a war zone or just coming back from one is going to spend $7 calling home and talking to someone. What's unlikely is it would be this small. The damage would be this little. As a matter of fact, they are low compared to what the contract itself had in its revenue sharing tables and what it anticipated for the revenues here. Another dose of record reality. Of that $7, the guest could get reimbursement for any official calling that it made. Sufi was required to link its system with the hotel invoicing system so that its telephone charges printed out on the invoices. The guest could take that and get reimbursed for it as the Air Force instruction applicable to all Air Force commands provided. We cited that instruction in our brief. So there is no economic reason for a guest to not use the Sufi phones in their rooms to make official calls or to somehow shorten the length of the call because it's going to be reimbursed for those calls. Now, I have just given you the entire statement of what the relevance of official and unofficial calls is in this case. It's only relevant to the guest who could get reimbursement for official calls. It was irrelevant to Sufi. It didn't make any difference because the distinction that the contract set up was between on-base calling and off-base calling. And all off-base calling was to go through Sufi system. There's so many details here. Forgive me if I'm just misremembering. Do I remember that the government says in its brief that the board specifically disagrees with your interpretation of what the contract indicated about official calls? They might have said that. They certainly say repeatedly that official calls are non-breach calls. Right. But didn't they quote a board finding? Do you know what I'm referring to? A board finding only in damages, Your Honor, and that's a point I want to make very clearly here because I think there is confusion about that in the government's brief. Official calls were not non-breach calls. They were breach calls as well. All off-base calling was breach call. That's the distinction between on-base and off-base, not official and unofficial. There were two phone systems on the basis, Sufi's phone system and the DSN system. Under Sufi's phone system, there's no dispute that all calls, whether official or unofficial, Sufi charged for and got reimbursed for. That was the way the contract was performed. There was no way on Sufi's system for it to differentiate between those calls. Now, the complicating factor comes because Sufi also agreed to connect its system to the DSN system that was already on the basis. And it agreed to do so. It first asked for 25 cents a call, even to connect to local calls, on-base calls, but then agreed to do it for free. But it still said we cannot allow, with this DSN connection, the guest to toll-skip and make off-base calls using the DSN system, which they could do by getting to the operator and then being connected long distance by the operator. So they made crystal clear in the contract that that was fraud, abuse, and toll-skipping. Those were the words the contract uses. And that any such calling would be blocked by Sufi. It was improper calling. Official, unofficial didn't matter. They were going to get revenue for all off-base calling. The board absolutely agreed with this on the merits. It made repeated determinations, not just once, but multiple times, that DSN coverage by Sufi was limited to on-base, local calling. Let me just sound out some sites here. In its first decision at Sufi 2, at appendix pages 65 and 66, it made that determination. In Sufi 8, in the merits part of the determinations of the decision, it made the same findings at paragraph 75 to 82 and at finding 97. And then also in Sufi 9, when it was reconsidering its damages, it made the same finding again on page 173. Sorry, you just keep jumping back and forth between joint appendix sites and paragraph sites without a joint appendix number, and now I just got confused. I apologize. Findings 75 through 82 are at appendix pages 111 and 12. And finding 97 is at appendix page 114. Mod 5 of the contract also says explicitly that DSN is, and now I'm quoting, limited to base level, close quote. In paragraph 77, which I think is on joint appendix 111, the board finds that DSN service was, quote, limited to local area, close quote, on-base calling only. In your calculations, what do you do about the under 10-minute calls? Do you include them? It depends on the claim. For hallway and lobby phones, there's no distinction. All calling was meant to be covered. For on-base, sorry, for other operator numbers where they went to a local number and then switched over to the operator and then went out, we took out calls under 10 minutes just as a safeguard to make sure we weren't getting any legitimate local calls, which averaged, the record said, two minutes each. So we're highly conservative in that. Now. Can you address Mr. Manhart's breakdown of the issues into two parts? One is the pool, 12 million or 120 million based on. Yeah, let's go right to that. And then what you do with it. Yeah. I wanted to put the spotlight on the board, the way they did the damages. And he's right, there are kind of two parts of the calculus here. But the board first ran off the rails when after finding on the merits that official and unofficial calls were no distinction, get all off-base calling. They said we don't get any official calls. Then when Sufi pointed out that inconsistency on reconsideration, the board in Sufi 9 admitted again that all off-base calls over DSM were fraud and soul skipping. Page 173 of the appendix. But instead of awarding Sufi his claims damages, it then changed his damages rationale. And what it said, without putting forward any record evidence, was that if the DSM phones had been taken out of the lodging and only Sufi phones were there, the guests might have gone elsewhere on the basis to make official calls instead of using those Sufi phones right there in their rooms. The board leveraged that rationale. Yes, Your Honor. What about the government's argument that the Court of Federal Claims found facts, whereas that's contrary to the standard of review under the Wunderlich Act? It's not contrary, Your Honor. The basic point here is that we exhausted our remedy below. They've waived their remand argument. You've seen both of those. But even if they hadn't, we exhausted. Under the Wunderlich Act, once there is a complete record that's been made, then the board is free to, based on that record, and consistent with proper fact findings, make its own fact determinations under its jurisdiction under the Tucker Act. Sufi gave, under the contract, the board one shot, and only one shot at doing this. There are plenty of examples that we cited. Court of Claims examples, Bann, Teledyne. We cited some more recent examples as well. A couple that you wrote, Judge Lori, Mekhan, and Northrop Grumman, in which there's a record below made that's found to be deficient for a reason of law or arbitrary and capricious for some reason. And then this court, or the reviewing court, as Judge Wheeler below, makes finding based on that record. That's what occurred here, and that was perfectly fine. Getting back, Judge Taranto, to the rationale the board used in setting those damages in Sufi 9, it leveraged the idea that someone might go off base to say that every guest would have gone off base to make an official call. And so it gave Sufi 0% of official calls, which is calculated to be an incredible 87% of the total volume. Now, it's obviously irrational to assume that all guests to make an official call, perhaps in their bathrobes and in cold weather, would have gone off to the base and tried to find another phone. It was probably a base they weren't even familiar with. It's also contrary to the record. It bears repeating that there was no incentive for them to go off outside their room to make a call, because they could be reimbursed for it. But the record evidence shows that these were short-term transient guests. They didn't have an office to go to to make calls. And, of course, the record begs the question, why did the Air Force expand its breach by putting in more DSM phones in the lodgings if they were already readily available on the base elsewhere to these guests? There's no evidence that DSM phones outside the lodging were readily accessible to the guests. Zero. Now, the second part of Mr. Manhart's calculation. The Board compounded its error. It already committed plenty for you to set it aside. But it compounded its error when it selected, okay, what are we going to take for the volume of these calls? In Sufi 8, it rejected as incompetent these records that Mr. Manhart has been praising, what we call the DISA data. The government, the Air Force, did not preserve the switch records on the base for these calls, for these DSM phones. So all we had was this partial copy of these records called the DISA data. The Board properly found that they were full of holes, incomplete, didn't take care of all the types of calls that were being made over these DSM lines and rejected it as incompetent evidence in Sufi 8. Then it turns right around in Sufi 9 and says it's going to use it. Clear error. It's just what's going on. Agencies, of course, in general, can change their minds. They do it all the time. So putting aside the fact that it said one thing in Sufi 8, what's wrong with what it said in Sufi 9 about the use of the data? First of all, it has found properly that it was full of holes and therefore incompetent data. As a result, that finding is entitled to finality because it's supported by substantial evidence. So Carlo Bianchi says that's good. And then it also rejected the way that we did it. We had three Sufi phones, which were... Oh, I say I'm into my time. Let me finish my question for you. It rejected our surrogates, our equivalent phones, because it said, well, they weren't DSM phones because they didn't differentiate between official and unofficial calls. We're back to the same basic error again. Those three phones were equivalent phones, though. They were placed in the lodgings at Sufi service, in the lounges and lobbies, and they had DSN access. The only differentiation was behind the cord to the guest. It was invisible to the guest. It just went through Sufi's system first, then Sufi passed it to the DSN system and out long distance. But because it passed through Sufi's system first, it was able to record the number and length of those calls. There were thousands, hundreds of thousands of call records on those three phones, over 10 years of experience altogether. It provided a more than fair and reasonable approximation of the damages, which the board unreasonably rejected. Thank you. Thank you, Mr. Tremblay. Mr. Manhoff. Thank you, Your Honor. I'd first like to address this question of official calls and the DSN service. I think if you review the decisions of the board, you'll find that my colleague's explanation of what the board found is incorrect. During appendix page 173, the board found expressly that Sufi was not entitled to revenue from official calling on the DSN line. And there's a path to this. At the original contract, Sufi proffered that it wanted to recover money for the DSN official calling, that it would make it available long distance calling in the rooms, but it wanted to charge a fee. The government struck that. The board analyzed that, and you can see the text of that portion of the contract. It's recited in the Sufi II decision at page JA55. The DSN phones were problematic. The notion of how to control guest usage about them was a problem in the administration of this contract. We don't dispute that. It was an issue for both sides. The parties negotiated about that, and that led to what, again, Sufi's counsel, Mr. Claybrook, identified as mod five. You can see mod five is in the joint appendix. You can also see the board's discussion of it at page JA173. That mod was necessary to change the original contract to relieve Sufi of the burden of having worldwide DSN access in the room phones. That had a change of the original term and now made the access base only from the rooms. It also charged a $0.15 fee for calling on those, and the DSN calling in the rooms subsided at that point. Separately, so to be very, very clear, the DSN system is a government-owned DOD-managed system. We were not going to pay Sufi to use our own system. The deal was that Sufi would connect to it, and official calling would be permitted. That was administered poorly, and there had to be changes. Mod five altered the room access to base level, and then because there was another thing, the government permits morale calls. Sufi agreed to the concept of morale calls, which, again, are free calls. They qualify as official calls. You can see testimony concerning this from a Sufi official at Joint Appendix page 254. That was permitted usage. It's undisputed, and that's the hallway phone that the witness is discussing. The board was very clear that official calling on a DSN line was permitted. It was the whole basis of its Sufi-8 decision with regard to the largest claims. I think if the court reviews the analysis of the board as to the contract handling of this DSN interaction, you will see that DSN long-distance service for official purposes was to be permitted as a free service. Very logical because that is a government-owned preexisting service for these duty stations. What Sufi was to do was to obtain its revenue through personal calling. Sufi disregards those distinctions in the bulk of these claims, and the board identified that and found that's why it was unable to follow the path of Sufi's construct. Its calculation, its methodology, as Yankee Atomic describes in that context, simply couldn't be utilized. Again, under the substantial evidence review, the board looked at what alternatives were there, and it looked at a larger volume of information that was available through these DISA records. Again, if you review Sufi-8, the board very candidly identified the strengths and weaknesses and problems of all the different switch records of the minutia of what information could have been used and relied upon. And it identified very candidly the weaknesses, but still agreed with the principle that there were losses and therefore resorted to a jury verdict, an approximation, and made a fair and sound estimate of all that was provable. I see my time is running out. Mr. Klobuchar did not address his cross-appeal in his opening position. No, you don't need to. Thank you. However, if you didn't address your cross-appeal, I think that we'll take it under advisement on the briefs. I appreciate that, Your Honor. Thank you. In the short time. Oh, am I out of time? No, you're out of time. You're out of time. You didn't address the cross-appeal. But I want to reply to what he said. Your opponent didn't reply to it. Thank you, Your Honor.  We shall take it up. Thank you, Your Honor. Thank you, Mr. Klobuchar.